**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

LEON MIDDLETON,
                Plaintiff,

     v.                                      No. 06-CV-1461
                                                    (GTS/DRH)

NAOMI FALK, M.D.; and ALBANY MEDICAL
CENTER,
                Defendants.

---

**APPEARANCES:**                              **OF COUNSEL:**

LEON MIDDLETON
Plaintiff Pro Se
02-A-5612
Eastern New York Correctional Facility
Post Office Box 338
Napanoch, New York 12458

MAYNARD, O'CONNOR, SMITH &          CHRISTOPHER K.H. DRESSLER, ESQ.
   CATALINOTTO, LLP                    JAMES D. DiPASQUALE, ESQ.
Attorneys for Defendant Albany Medical
   Center
6 Tower Place
Albany, New York 12203

THORN GERSHON TYMANN & BONANNI,     KYLE N. KORDICH, ESQ.
   LLP                                            ERIN P. MEAD, ESQ.
Attorneys for Defendant Falk
5 Wembley Court, New Karner Road
Post Office Box 15054
Albany, New York 12212-5054

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Leon Middleton ("Middleton"), an inmate in the custody of the New

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, Albany Medical Center ("AMC") and Dr. Naomi Falk ("Falk"),[2] violated his constitutional rights under the Fifth, Sixth, and Eighth Amendments and engaged in medical malpractice, fraud, misrepresentation, conspiracy, and intentional infliction of emotional pain and suffering under New York State law.  Docket No. 1.  Presently pending are defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56.  Docket Nos. 50, 53.  Middleton opposes the motions.  Docket No. 56.  For the reasons which follow, defendants' motions should be granted.

**I. Background**

The facts are related herein in the light most favorable to Middleton as the non-moving party.  See subsection II(A) infra.

Prior to Middleton's incarceration in 2001, he began to experience pain and blurred vision in his left eye.  Middleton Dep. (Docket No. 53-7-8) at 18.  Initially, Middleton sought treatment at the Mount Vernon Neighborhood Health Center where it was recommended he see a specialist, but Middleton was arrested prior to seeing the specialist.  Id. at 19.  Shortly after his incarceration, Middleton was referred to the Westchester Medical Center ("Westchester") for an evaluation of his left eye.  Id. at 20.  The physicians informed Middleton that he had a cyst in his eye and a problem with his retina, but they did not offer any treatment options.  Id. at 15-18, 20-24.

At the end of 2004, Middleton was transferred to Coxsackie Regional Medical Unit

---

[2] Dr. George Peters, III was previously dismissed as a defendant in this action.  Docket Nos. 48, 49.

2

("RMU").  Middleton Dep. at 24.  On or about October 8, 2003, Middleton was examined by eye specialists who noted that he had a "longstanding retinal detachment [of the left] eye with intraretinal cyst[s]."  Docket No. 50-11 at 1.  Additionally, the treatment notes stated that Middleton had been experiencing the blurry, half-vision in his left eye for two and a half to three years.  Id.  Middleton was diagnosed with a detached retina and was recommended to see a retinal specialist.  Middleton Dep. at 24-26.

On or about November 12, 2003, Middleton was examined by Peters, who advised him that he was a candidate for surgery and that the detached retina could be repaired.  Middleton Dep. at 26; Docket 50-10 at 37; Kieval Aff. (Docket No. 53-12) ¶ 3.  According to Hamilton, Peters "didn't explain . . . the risks [of any surgical procedures because] he didn't have enough time to do that . . . ."  Middleton Dep. at 28.  However, the treatment notes reflect that on January 13, 2004, "[a]fter the risks [and] benefits of and alternatives to the planned procedure were discussed with [Middleton]," Peters performed Middleton's first surgery to repair his retinal detachment.[3]  Docket No. 50-10 at 34-36; Docket No. 50-11 at 11-15, 36-38; Kieval Aff. ¶ 4.[4]

Falk[5] assisted Peters in the operation, performing the limited role of "helping to isolate

---

[3] The first surgery was a vitrectomy "which involve[d] the removal of vitreous material from the . . . eye and the use of gases in an effort to push the retina back onto the wall of the eye."  Kieval Aff. ¶ 4.

[4] All parties have submitted copies of Middleton's medical records.  Thus, there are multiple copies of the same pages in the record.  Therefore, references herein to the medical records will generally be to Docket No. 50 as those appear to be organized in the most user-friendly manner.

[5] Falk is "currently a Partner at Retinal Consultants . . . treat[ing] numerous patients with retinal detachments and . . . perform[ing] numerous procedures in an attempt to repair such problems and/or prevent additional complications."  Falk Aff. ¶ 1.  Dr. Falk has

3

the [optic] muscle, keeping the eye lubricated, rotating the eye and making sure the light was where Dr. Peters needed it." Falk Aff. (Docket No. 50-18) ¶¶ 6,9; Stern Aff. (Docket No. 50-24) ¶ 8. Falk opined that due to Middleton's "severe chronic retinal detachment and retinal cysts . . . , the expectation in performing the surgery was not to improve [Middleton's] eyesight, but rather to prevent additional complications . . . [such as] the eye . . . shrivel[ing] up from a lack of nutrition . . . [or] complete blindness." Falk Aff. ¶¶ 7-8; see also Stern Aff. ¶¶ 10-13 (explaining that old retinal detachments and multiple cysts, such as Middleton's, cause "low grade inflammation and fibrosis . . . [which] make surgical repair difficult[, but] the standard of care is still . . . surgery because the risks posed by untreated chronic retinal detachments are significantly greater then the risk . . . [of] repair."). Middleton was examined the following day for post-operative status and was given prescriptions for three medications. Middleton Dep. at 33.

Middleton was examined again by Peters on February 2, 2004, and was told to continue his medications and that he was doing well. Id. at 29-31. However, once the bandages were removed, everything was blurry and he could only see light and shadows. Id. at 30. Middleton returned on February 12, 2004 for another examination, he was informed that his retina had again detached, and Peters advised that he wished to perform another surgery using silicone oil instead of air to attempt to reattach the retina. Middleton Dep. at 31-32, 79-80; Docket No. 50-11 at 26; Stern Aff. ¶ 14 (explaining that a detachment after surgery is not uncommon and "is not indicative of medical error, but is rather simply consistent with the complicated nature of the surgery and the complex nature of the problem."); Kieval Aff.

---

privileges at AMC and thus is allowed to see patients and perform surgeries there. Id. Additionally, at the time of Middleton's treatments, Falk worked with Peters, who was also an employee of the Retinal Consultants. Id. ¶ 6.

4

¶¶ 5 ("Unfortunately, [Middleton] experienced a well known and recognized complication . . . in that the retina once again became detached . . . [as well as] develop[ing] a cataract . . . [in] the left eye . . . .").

On February 13, 2004, Middleton underwent his second surgical procedure with Peters to repair the retinal detachment and remove the cataract.[6]  Docket No. 50-10 at 24-25; Docket No. 50-12 at 8-11, 28-31; Kieval Aff. ¶ 6.  After the surgery, Middleton was again given eye drops, initially to be taken three times daily and then decreased to twice daily.  Middleton Dep. at 32-33.  After this second surgery, Middleton was unable to see anything with his left eye other than light and shadows.  Id. at 33-34, 36; Kieval Aff. ¶ 8.  Additionally, Middleton's eye was very irritated and would itch and burn.  Middleton Deo. at 35-36, 89-91.  Peters recommended that Middleton continue to take his medication and eye drops, which seemed sporadically to alleviate the pain for a short time.  Id. at 36.

Middleton was examined by Peters numerous times over the next twelve months.  Id. at 36; Docket 50-11 at 17-23.  At one examination, Middleton asked why he did not receive a corneal transplant and was told that a corneal transplant was an inappropriate treatment, an opinion with which Middleton later agreed.  Middleton Dep. at 37-40, 61-63.

Middleton underwent his third and final surgery on March 8, 2005.  Id. at 40; Docket No. 50-10 at 14-15.  Middleton believed that Peters was performing the surgery, but at the last minute, Middleton discovered that it would be performed by Falk.  Middleton Dep. at 59-61, 82-84; Kieval Aff. ¶ 10 ("It is not unusual for a surgeon in a practice to provide care and treatment, including surgery, on patients of the practice even if another physician . . . had

---

[6] This surgery required that "the lens that had the cataract [be] removed . . . and replaced with a prosthetic lens . . . ."  Kieval Aff. ¶ 6.

previously been involved in that patient's care."). Prior to surgery, Falk "had a conversation with [Middleton] in which [she] obtained informed consent [and] discuss[ed] . . . the potential risks and complications of the surgery, including infection, hemorrhage, surgical failure, blindness and the need for additional future surgeries." Falk Aff. ¶ 14; Middleton Dep. at 43-49.

Falk then attempted to repair Middleton's posterior capsular opacity and chronic traction retinal detachment. Docket No. 50-10 at 14; Docket No. 50-12 at 1-4, 52-55. Again, Falk stated that "the purpose of this surgery was not to restore vision to [Middleton's] left eye, but rather to clean off the opacity on the implant so that the back of the eye could be visualized." Falk Aff. ¶ 18; Stern Aff. ¶ 18 (explaining that this is "a common procedure [which was] . . . certainly indicated."). The following day, Falk examined Middleton, prescribed eye drops, and directed him to seek follow-up care at AMC. Docket No. 50-10 at 16; Falk Aff. ¶¶ 20-22; Stern Aff. ¶¶ 23-26. Middleton continued to see Peters throughout the Summer of 2005. Docket No. 50-10 at 8-9, 10; Docket 50-11 at 7-8, 10.

Currently, Middleton is seeing different opthamalogists at RMU. Middleton Dep. at 63-68. MIddleton has lost all vision in his left eye and was advised that he will never regain his sight. Id. at 63-64, 73.[7] Middleton continues to be monitored for glaucoma and, if the pressure in his eye becomes too great, his eye will need to be removed and replaced with a prosthetesis. Id. at 67-68.

---

[7] Another medical expert opined that Middleton suffers from proliferative vitreo retinopathy ("PVR") which "is the most common complication following . . . the type of retinal detachment experienced by [Middleton]." Kieval Aff. ¶ 11. "PVR refers to the growth of the cellular membranes within the vitreous cavity and on the . . . retina [which form] scar tissue that . . . may result in recurrences of retinal detachment." Id. After PVR develops, the retina, a "normally . . . thin, very pliable membrane, becomes stiff . . . result[ing] in disappointing visual results, including lack of vision."

## II. Discussion

Middleton contends that the multiple surgeries defendants performed constituted (1) deliberate indifference to his serious medical condition, (2) a conspiracy in which Peters and Falk used him to experiment, and (3) multiple state law torts violations. Defendants jointly argue that (1) Middleton has failed to exhaust his administrative remedies, (2) there is no merit to any of the constitutional or state law claims, (3) Falk is entitled to qualified immunity, and (4) AMC cannot be held liable.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

## B. Exhaustion

As a threshold matter, defendants contend that Middleton has failed to exhaust his administrative remedies. Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 126 S. Ct. 2378, 2382-83 (2006). This exhaustion requirement applies to all prison condition claims. Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. Nussle, 534 U.S. at 524.

8

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)). Exhaustion is generally achieved through the Inmate Grievance Program (IGP).[8] See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1 et seq. (2001). However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the action complained of." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. Id. at 688. Courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." Hargrove v. Riley, No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y. 2007) (internal

---

[8]"The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

citations omitted).

Generally, of course, actions brought by inmates under § 1983 are asserted against prison officials who are subject to DOCS regulations, including the IGP.  Here, Middleton brought this action against a private hospital and a private physician neither of whom is subject to the IGP.  Research has revealed no cases directly addressing this issue.  However, Middleton was treated by defendants at the behest of DOCS, which was responsible for providing for Middleton's care.  Thus, whether Middleton's claims of inadequate care are asserted only against private parties such as Falk and AMC or also agaonst DOCS or its employees, the exhaustion requirement applied because in either event, the IGP process would have afforded Middleton opportunities to remedy and DOCS to correct any asserted or demonstrated deficiencies.  See generally Porter, 534 U.S. at 524.  Thus, Middleton was required to observe the requirements of the administrative remedy process even though his claims here were asserted only against non-DOCS parties.

Here, there is no indication that Middleton ever filed, or attempted to file, grievances relating to his care prior to filing the present action.  Additionally, Middleton makes no assertions implied or otherwise that the grievance process was unavailable to him.  Moreover, Middleton failed to proffer any special circumstances which would have rendered the grievance process futile or inaccessible to excuse his failures to utilize the IGP.

Therefore, defendants' motions should be granted on this ground.

### C. Fifth & Sixth Amendments

Middleton includes in his complaint a claim that defendants' conduct violated his rights

under the Fifth and Sixth Amendments.

The Fifth Amendment pertains to criminal charges and prohibits the federal government from violating a person's due process rights.  See Public Utilities Comm'n v. Pollak, 343 U.S. 451, 461 (1952); Am. Bankers Mortgage v. Fed. Home Loan Mortgage, 75 F.3d 1401, 1406 (9th Cir. 1996); Birdsall v. City of Hartford, 249 F. Supp. 2d 163, 170 (D. Conn. 2003). The Sixth Amendment pertains to criminal prosecutions and the right to a speedy trial with process for obtaining witnesses and acquiring representation.  U.S. CONST. amend. IV. As this case is civil and not criminal in nature and asserts no conduct by any federal employee, official, or entity, the Fifth and Sixth Amendments do not apply.  Thus, these amendments have no application to the allegations of Middleton's complaint and defendants should be granted judgment on those claims.

### D. Eighth Amendment

Middleton's principal claims arise under the Eighth Amendment.  The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  This provision encompasses the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold.  First, the prisoner must show that there was a sufficiently serious medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the

11

prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. Id. at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for

12

specialists . . . are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

In this case, the loss of vision in Middleton's left eye constituted a serious medical need. See Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996) (holding that visual impairments such as double vision and the loss of depth perception constitute a serious medical need); Alwood v. Montgomery, No. 07-CV-373 (WL), 2007 WL 4335462, at *2 (N.D. Ind. Dec. 7, 2007) (holding that blindness from glaucoma constitutes a serious medical need); Trahan v. Reinkens, No. H-05-173, 2007 WL 2142075, at *3 (S.D. Tex. July 25, 2007) ("[L]oss of vision in one eye constitutes a serious medical need.")

However, Middleton has not alleged facts sufficient to show deliberate indifference on the part of either remaining defendant. First, Falk performed a medically indicated surgery, Middleton's third, to which Middleton consented. This consent was memorialized in multiple consent forms signed by Middleton after discussion with Falk. Falk Aff. ¶ 14; Middleton Dep. at 43-49. Falk performed the surgery without any complications. She also followed-up with Middleton, removing his bandages and prescribing medication to quicken the healing process. Docket No. 50-10 at 16; Falk Aff. ¶¶ 20-22; Stern Aff. ¶¶ 23-26. Thus, Falk acted reasonably and without delay. Any adverse effects which Middleton suffered as a consequence of the surgery required to attempt to correct his serious retinal detachment are, at best, negligence. As noted, negligence is insufficient to sustain a claim under the Eighth Amendment. Moreover, to the extent Middleton opines that a corneal transplant

13

should have been performed, his assertions constitute mere differences of opinion as to the proper course of treatment. This too, is insufficient to sustain a constitutional claim.

Additionally, Middleton alleges that AMV too was deliberately indifferent to his serious medical needs because Falk and Peters enjoyed privileges at AMC. However, like a municipality for which liability is precluded under § 1983 due to vicarious liability, private entities are also shielded from liability. See Scott v. Abate, No. 93-CV-4589 (CPS), 1995 WL 591306, at *9 (E.D.N.Y. Sept. 27, 1995) (citations omitted). Such private entities include hospitals. See generally Temple v. Albert, 719 F. Supp. 265, 268 (S.D.N.Y. 1989) (citations omitted). Middleton must allege more than mere supervisory liability by AMC, such as contentions that his loss of vision was due to an AMC policy or custom. Sykes v. City of New York, No. 93-CV-6577, 1994 WL 570824, at *3 (S.D.N.Y. Oct. 17, 1994). However, Middleton has failed to proffer any specific facts to support a claim that AMC instituted a policy or custom which resulted in his blindness. Additionally, any such claims were wholly conclusory and insufficient to withstand a motion for summary judgment.

Accordingly, defendants' motions should be granted on this ground.

### E. Conspiracy

Liberally construing Middleton's complaint, he alleges that Peters and Falk conspired to use him to perform unnecessary surgeries in violation of his constitutional rights.

"Section 1985 prohibits conspiracies to interfere with civil rights." Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  To demonstrate that a conspiracy existed, "the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights."  Salgado v. City of N.Y., No. 00-CV-3667 (RWS), 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted).  "In addition, the conspiracy must be motivated by some class-based animus."  Iqbal, 490 F.3d at 176 (citations omitted).

Here, Middleton does not assert any facts giving rise to a conspiracy.  First, Middleton vaguely asserts conclusory statements relating to an alleged conspiracy among defendants.  This is insufficient.  See X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 71 (2d Cir. 1999). Second, there are no allegations relating to agreements, or even communications, between Falk and Peters.   Finally, there are no allegations or indications that any of defendants' actions were motivated by any class-based animus.

Accordingly, defendants' motion  as to this claim should be granted.[9]

### F. Remaining State Law Claims

"Where a district court has dismissed all claims over which it has original jurisdiction, the

---

[9] Defendants also assert that any conspiracy claims are effectively barred by the intracorporate conspiracy doctrine.  However, because it is recommended herein that defendants' motions as to the conspiracy claim be granted on other grounds, the intracorporate conspiracy doctrine need not be addressed.

court may decline to exercise jurisdiction over state law claims." Hurley v. County of Yates, No. 04-CV-6561, 2005 WL 2133603, at *3 (W.D.N.Y. Aug. 31, 2005) (citing 28 U.S.C. § 1367(c)(3)); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (citations omitted) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if . . . not present a federal court should hesitate to exercise jurisdiction over state claims."). Thus, because all of Middleton's federal claims will be dismissed if the recommendations herein are accepted, the interests of judicial economy, convenience and fairness will not be upheld by continuing to litigate the state law claims in this forum. Therefore, if the recommendation to grant judgment to defendants on Middleton's federal law claims is accepted, the remaining state law claims should be dismissed.

Accordingly, defendants' motions on this ground should be granted.

### G. Qualified Immunity

Finally, defendants claim that even if Middleton's constitutional claims are substantiated, Falk is entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights." Smith v. City of Albany, No. 03-CV-1157,

2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached concerning any of Middleton's claims because, for the reasons discussed above, Middleton has failed to raise a question of fact as to the first prong of the inquiry.

Accordingly, in the alternative, Falk's motion on this ground should be granted.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendant AMC's motion for summary judgment (Docket No. 50) be **GRANTED** as to all federal law claims;

2. Defendant Falk's motion for summary judgment (Docket No. 53) be **GRANTED** as to all federal law claims;

3. Middleton's state law claims be **DISMISSED** in their entirety as to both defendants; and

4. The action be **TERMINATED** in its entirety in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 20, 2009
       Albany, New York

*David R. Homer*
United States Magistrate Judge